**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| AMERICAN OVERSIGHT, | |
| Plaintiff, | |
| v. | Civil Docket No. 20-cv-00716 (RJL) |
| DONALD J. TRUMP, in his official capacity as PRESIDENT OF THE UNITED STATES, *et al.*, | |
| Defendants. | |

## MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................... 1

BACKGROUND .................................................................................................................... 3

1.     STATUTORY BACKGROUND ................................................................................... 3

2.     FACTUAL BACKGROUND ....................................................................................... 4

3.     PROCEDURAL HISTORY ......................................................................................... 6

STANDARD OF REVIEW ..................................................................................................... 7

ARGUMENT ........................................................................................................................ 9

I.     FACA DOES NOT PROVIDE A PRIVATE RIGHT OF ACTION ............................... 10

II.    DEFENDANTS ARE NOT "AGENCIES" SUBJECT TO THE
ADMINISTRATIVE PROCEDURE ACT .................................................................... 11

III.   PLAINTIFF CANNOT ESTABLISH A "CLEAR AND INDISPUTABLE"
RIGHT TO MANDAMUS AND THEREFORE THIS COURT LACKS
MANDAMUS JURISDICTION ................................................................................... 16

    A. Mandamus Requires a "Clear and Indisputable Right to Relief," a Demanding
       Standard That is Even More Stringent When Applied Against the White
       House. ................................................................................................................. 17

    B. Plaintiff Cannot "Clearly and Indisputably" Show That the So-Called
       "Clemency Task Force" Is Subject to FACA. ...................................................... 18

         1.  The So-Called "Clemency Task Force" Lacks Sufficient Formality and
            Structure. ................................................................................................... 19

         2.  The So-Called "Clemency Task Force" Was Not "Established or
            Utilized" by the White House. ................................................................... 24

         3.  Non-Federal Employees Lack a Vote or a Veto. .......................................... 26

         4.  Applying FACA to Advice About the President's Pardon
            Determinations Would Constitute Impermissible Interference With the
            President's Article II Powers. ..................................................................... 28

CONCLUSION ..................................................................................................................... 30

# <u>TABLE OF AUTHORITIES</u>

## CASES

*13th Regional Corp. v. Dep't of the Interior*,
  653 F.3d 758 (D.C. Cir. 1980) ............................................................ 17

*\*AAPS v. Clinton*,
  997 F.2d 898 (D.C. Cir. 1993) ..................................................... *passim*

*Alexander v. Sandoval*,
  532 U.S. 275 (2001) ........................................................................... 10

*Am. Civil Liberties Union v. Trump*,
  266 F. Supp. 3d 133 (D.D.C. 2017) ..................................................... 3

*Am. Hosp. Ass'n v. Burwell*,
  812 F.3d 183 (D.C. Cir. 2016) ........................................................... 17

*Armstrong v. Exec. Office of the President*,
  90 F.3d 553 (D.C. Cir. 1996) ............................................................. 14

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ......................................................................... 7, 8

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ......................................................................... 7, 8

*Byrd v. EPA*,
  174 F.3d 239 (D.C. Cir. 1999) ........................................... 24, 25, 26, 28

*\*Cheney v. U.S. Dist. Ct. for Dist. of Columbia*,
  542 U.S. 367 (2004) ..................................................... 16, 17, 18, 28

*Citizens for Responsibility & Ethics in Wash. ("CREW") v. Office of Admin.*,
  566 F.3d 219 (D.C. Cir. 2009) ...................................................... 13, 15

*Citizens for Responsibility & Ethics in Washington v. Leavitt*,
  577 F. Supp. 2d 427 (D.D.C. 2008) ....................................... 9, 20, 21, 23

*Ctr. for Arms Control & Non-Proliferation v. Pray*,
  531 F.3d 836 (D.C. Cir. 2008) .......................................................... 8, 29

*Ctr. for Biological Diversity v. Tidwell*,
  239 F. Supp. 3d 213 ..................................................................... 11, 24

ii

*Democracy Forward Found. v. White House Office of American Innovation*,
356 F. Supp. 3d 61 (D.D.C. 2019) ..................................................................... 15, 16

*Dong v. Smithsonian Inst.*,
125 F.3d 877 (D.C. Cir. 1997) .................................................................................. 13

*Dunlap v. Presidential Advisory Comm'n on Election Integrity*,
944 F.3d 945 (D.C. Cir. 2019) ............................................................................. 16, 17

*Dunlap v. Presidential Advisory Comm'n on Election Integrity*,
No. 17-2361, 2020 WL 2800673 (D.D.C. May 29, 2020) ......................................... 8

*Elec. Privacy Info. Ctr. v. Drone Advisory Committee*,
369 F. Supp. 3d 27 (D.D.C. 2019) ........................................................................... 11

*Elec. Privacy Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*,
266 F. Supp. 3d 297 (D.D.C. 2017) .......................................................................... 16

*\*Food & Water Watch v. Trump*,
357 F. Supp. 3d 1 (D.D.C. 2018) ...................................................................... *passim*

*Franklin v. Massachusetts*,
505 U.S. 788 (1992) ................................................................................................. 11

*Freedom Watch, Inc. v. Obama*,
807 F. Supp. 2d 28 (D.D.C. 2011) ...................................................................... 11, 19

*Freedom Watch, Inc. v. Obama*,
930 F. Supp. 2d 98 (D.D.C. 2013) ........................................................................ 9, 23

*Grigsby Brandford & Co. v. United States*,
869 F. Supp. 984 (D.D.C. 1994) ............................................................................... 22

*In re Cheney*,
334 F.3d 1096 (D.C. Cir. 2003) ............................................................................... 18

*\*In re Cheney*,
406 F.3d 723 (D.C. Cir. 2005) ......................................................................... *passim*

*In re Medicare Reimbursement Litig.*,
414 F.3d 7 (D.C. Cir. 2005) ..................................................................................... 17

*Int'l Counsel Bureau v. CIA*,
No. 09-2269 (JDB), 2010 WL 1410561 (D.D.C. Apr. 2, 2010) ............................... 16

iii

*Jerome Stevens Pharm., Inc. v. FDA,*
    402 F.3d 1249 (D.C. Cir. 2005) ........................................................................... 7

*Judicial Watch, Inc. v. U.S. Dep't of Commerce,*
    736 F. Supp. 2d 24 (D.D.C. 2010) ................................................................. 9, 25

*Judicial Watch, Inc. v. U.S. Secret* Service,
    726 F.3d 208 (D.C. Cir. 2013) ........................................................................... 15

*Kentucky v. Graham,*
    473 U.S. 159 (1985) ........................................................................................... 12

*Kissinger v. Reporters Committee for Freedom of the Press,*
    445 U.S. 136 (1980) ...................................................................................... 12, 13

*Lawyers' Comm. for Civil Rights Under Law v. Presidential Advisory Comm'n on Election Integrity,*
    265 F. Supp. 3d 54 (D.D.C. 2017) ..................................................................... 11

*Lujan v. Defs. of Wildlife,*
    504 U.S. 555 (1992) ............................................................................................. 7

*Meyer v. Bush,*
    981 F.2d 1288 (D.C. Cir. 1993) .................................................................... 13, 14

*Nader v. Baroody,*
    396 F. Supp. 1231 (D.D.C. 1975) ..................................................................... 22

*Nat'l Sec. Archive v. Archivist of the U.S.,*
    909 F.2d 541 (D.C. Cir. 1990) ........................................................................... 15

*Pac. Legal Found. v. Council on Envtl. Quality,*
    636 F.2d 1259 (D.C. Cir. 1980) ......................................................................... 14

*Power v. Barnhart,*
    292 F.3d 781 (D.C Cir. 2002) ............................................................................ 17

*\*Public Citizen v. U.S. Dep't of Justice,*
    491 U.S. 440 (1989) ..................................................................................... *passim*

*Renne v. Geary,*
    501 U.S. 312 (1991) ............................................................................................. 7

*Rushforth v. Council of Econ. Advisers,*
    762 F.2d 1038 (D.C. Cir. 1985) .................................................................... 13, 14

*Schick v. Reed*,
    419 U.S. 256 (1974) ........................................................................................ 4, 29, 30

*Scott v. District Hospital Partners, L.P.*,
    60 F. Supp. 3d 156 (D.D.C. 2014) ............................................................................ 8

*Sculimbrene v. Reno*,
    158 F. Supp. 2d 26 (D.D.C. 2001) .......................................................................... 15

*Sierra Club v. Andrus*,
    581 F.2d 895 (D.C. Cir. 1978),
    *rev'd on other grounds*, 442 U.S. 347 (1979) ........................................................ 14

*\*Soucie v. David*,
    448 F.2d 1067 (D.C. Cir. 1971) ................................................................... 12, 13, 14

*Sweetland v. Walters*,
    60 F.3d 852 (D.C. Cir. 1995) ...................................................................... 13, 14, 15

*Union of Concerned Scientists v. Wheeler*,
    954 F.3d 11 (1st Cir. 2020) ...................................................................................... 11

*United States v. Espy*,
    145 F.3d 1369 (D.C. Cir. 1998) ............................................................................... 16

*VoteVets Action Fund v. United States Dep't of Veterans Affairs*,
    414 F. Supp. 3d 61 (D.D.C. 2019) ........................................................ 8, 19, 24, 25

*Wright v. Foreign Serv. Grievance Bd.*,
    503 F. Supp. 2d 163 (D.D.C. 2007),
    *aff'd*, No. 07-5328, 2008 WL 4068606 (D.C. Cir. Mar. 17, 2008) ........................... 7

**STATUTES**

5 U.S.C. app. 2 § 2 ............................................................................................................ 3

5 U.S.C. app. 2 § 3 ................................................................................................. 3, 24, 27

5 U.S.C. app. 2 § 9 ............................................................................................................ 3

5 U.S.C. app. 2 § 10 .......................................................................................................... 3

5 U.S.C. app. 2 §§ 1-16 ..................................................................................................... 3

5 U.S.C. § 551 .................................................................................................... 11, 12, 13

5 U.S.C. § 552 ................................................................................................................ 13

**RULES**

Fed. R. Civ. P. 12 ..................................................................................................... 7, 8, 9

Fed. R. Civ. P. 56 ............................................................................................................ 9

**UNITED STATES CONSTITUTION**

U.S. Const. Art. II, § 2 cl. 1 ............................................................................................ 4

**OTHER AUTHORITIES**

Executive Office of the President, Annual Report to Congress on White House Office Personnel (June 28, 2019), https://www.whitehouse.gov/wp-content/uploads/2019/06/July-1-2019-Report-FINAL.pdf ............................................................................................................. 15

H.R. Rep. No. 93-1380 (1974) ........................................................................................ 13

Presidential Memorandum on the White House Office of American Innovation § 1 (Mar. 27, 2017), https://www.whitehouse.gov/presidential-actions/presidential-memorandum-white-house-office-american-innovation/ ................................................................................... 15

# INTRODUCTION

This Federal Advisory Committee Act ("FACA") case asserts the existence and operation of an alleged federal advisory committee that does not exist and has never operated.

As part of the President's plenary Article II power to issue pardons and commutations, he solicits advice and recommendations from a number of sources, including private individuals. These individuals give advice on an *ad hoc*, informal basis.  The White House has not created, nor does it utilize, a formalized group of private citizens to offer collective advice to the President on the clemency process.  It does not plan to do so, and any individuals who claim to be part of such a group are mistaken.  In short, there is no formal group providing collective clemency advice – and absent such a group, there is no committee subject to FACA.  After all, as the Supreme Court held three decades ago, FACA was not "intended to cover every formal and informal consultation between the President . . . and a group rendering advice." *Public Citizen v. U.S. Dep't of Justice*, 491 U.S. 440, 453 (1989).

Plaintiff nonetheless claims that FACA, which imposes significant requirements on advisory committees, applies to instances of informal advice.  It posits the existence of a so-called "Clemency Task Force" that offers collective determinations on clemency candidates and the clemency process writ large.  And it claims that by constituting such an alleged group, the White House has violated FACA and the Administrative Procedure Act, and that plaintiff is entitled to the "extraordinary" remedy of mandamus.  It is wrong on all accounts.

At the onset, plaintiff fails to satisfy numerous threshold requirements.  It cannot sue directly under FACA (Counts I-III), because the Act lacks a private right of action.  It cannot sue under the APA (Count IV), because none of the defendants are an "agency" subject to its cause of action: the President is not an agency subject to the APA, and neither is the White House Office

1

(of which Jared Kushner, the other official capacity defendant, is a member), or the Executive Office of the President as a stand-alone entity.  Nor can plaintiff satisfy the stringent standards required to invoke this Court's mandamus jurisdiction (Count V).  Such jurisdiction exists only when a mandatory duty is "clear and indisputable," a narrowly defined standard that is even more narrowly defined when mandamus is sought against the President or his closest advisors, as here.

There is no such mandatory duty.  To be subject to FACA, a committee must satisfy numerous necessary (though not sufficient) elements, including (1) having sufficient indicia of formality and structure; (2) being formally enacted or utilized (*i.e.*, controlled) by the government; and (3) having non-governmental members with a vote or veto over the committee's collective recommendations.  Plaintiff fails to adequately plead *any* of these requirements.  Moreover, to the extent that it does allege a few facts, those are demonstrably wrong.  As the attached declaration of Ja'Ron K. Smith, Deputy Assistant to the President and Deputy Director of the Office of American Innovation within the White House Office, makes clear, there is no "Clemency Task Force" resembling plaintiff's made-up description.  No such group was ever created; no such group has ever been directed or funded by the White House; no such group met on a regular or recurring basis with government officials; and, most importantly, the White House did not create or approve a process of collective advice through which members of a group were able to vote on or veto recommendations. There are none of the necessary hallmarks of a FACA.  Absent these required factors, there is no committee subject to FACA, and thus no mandatory duty that could provide this Court with jurisdiction under the Mandamus Act.

Plaintiff faces still one more hurdle.  The D.C. Circuit and the Supreme Court have made clear that FACA must be interpreted to avoid constitutional problems caused by construing the Act to interfere with the President's Article II powers.  And yet that is precisely what plaintiff

2

would do here – construe FACA to cover informal advice to the President about his plenary pardon and commutation powers.  Such an interpretation would, at a minimum, raise serious constitutional concerns, and thus must be avoided.  Given all these factors, plaintiff cannot establish a "clear and indisputable" right to relief, and thus cannot establish mandamus jurisdiction.

## BACKGROUND

### 1.    STATUTORY BACKGROUND

Congress enacted the Federal Advisory Committee Act ("FACA"), 5 U.S.C. app. 2 §§ 1-16, to reduce the growing cost of unnecessary blue ribbon commissions, advisory panels, and honorary boards established by the government to advise the President and federal agencies.  *See Pub. Citizen v. U.S. Dep't of Justice*, 491 U.S. 440, 445 (1989) (citing 5 U.S.C. app. 2 § 2(b)).  To achieve these goals, FACA imposes a number of procedural requirement on committees which are "established or utilized by the President . . . in the interest of obtaining advice or recommendations."  5 U.S.C. app. 2 § 3(2).  These requirements include that every advisory committee "file a charter before meeting or taking any action, hold its meetings open to the public, publish timely notice of each such meeting in the Federal Register, keep minutes and other records of its meetings, and allow interested persons . . . to attend, appear before, or file statements with the committee."  *Am. Civil Liberties Union v. Trump*, 266 F. Supp. 3d 133, 135 (D.D.C. 2017) (citing 5 U.S.C. app. 2 §§ 9(c), 10(a)(1), 10(a)(2), 10(a)(3), 10(c)).  Advisory committees must also make available for public inspection and copying the various records, reports, meeting minutes, and any other documents "which were made available to or prepared for or by" the advisory committee.  5 U.S.C. app. 2 § 10(b).

"Given the serious separation-of-powers concerns inherent in legislation that imposes requirements on executive decision-making, courts interpret FACA narrowly.  The executive may,

of course, consult with private advisors or stakeholders without triggering FACA." *Food & Water Watch v. Trump*, 357 F. Supp. 3d 1, 10 (D.D.C. 2018).   Moreover, while FACA's "reach is extensive," the Supreme Court has made clear that it "cannot believe that it was intended to cover every formal or informal consultation between the President or an Executive agency and a group rendering advice." *Pub. Citizen*, 491 U.S. at 453 & n.8.

## 2.    FACTUAL BACKGROUND

Article II of the U.S. Constitution grants the President the express and plenary power to "grant Reprieves and Pardons . . . except in Cases of Impeachment," U.S. Const. Art. II, § 2 cl. 1, subject only to the "limitations, if any [that are] found in the Constitution itself." *Schick v. Reed*, 419 U.S. 256, 267 (1974).

"The clemency process within the White House is coordinated by the Office of White House Counsel, generally in consultation with the Department of Justice's Office of the Pardon Attorney."   Decl. of Ja'Ron Smith ("Decl.") ¶ 3 [attached hereto as Ex. 1].   "The names of clemency candidates can originate from many sources," *id*. ¶ 4, and "[a]s part of the decision-making process, the President and his advisers often informally solicit and receive suggestions for potential clemency candidates from private parties and members of the public," *id*. ¶ 5; *see also id*. ¶¶ 6-11 (giving examples of informal recommendation process).

Plaintiff claims that "[o]n information and belief, in late 2019, Defendant President Trump and/or Defendant [Jared] Kushner [in his official capacity as Senior Advisor to the President] established a working group including both federal employees and non-governmental individuals," Compl. ¶ 33, so as to "provide collective advice and recommendations to Defendant President Trump, regarding potential changes to the pardon and clemency process as well as the evaluation of particular candidates for pardons and commutations," *id*. ¶ 34.   Plaintiffs dub this so-called

4

working group the "Clemency Task Force," *id.* ¶ 35, and aver that it is an "advisory committee established and utilized by" the defendants, *id*. ¶ 36.  Plaintiff alleges that this task force is composed of a number of individuals, including Mr. Kushner, Ja'Ron Smith, Pam Bondi, Alice Marie Johnson, Matthew Whitaker, Van Jones, Brett Tolman, Mark Holden, Paul Larkin, Marc Levin, and Kevin Roberts.  *Id*. ¶¶ 39-57.  It further alleges that the task force "has reviewed, discussed, and provided advice and recommendations to the President regarding applications for pardons or commutations," *id*. ¶ 61; *see also id*. ¶¶ 62-68, 70-74, and that it has "met several times since late 2019,"[1] *id*. ¶ 62.

These allegations, are, however, belied by the facts.  "Although the President and his advisers receive input on clemency issues from a variety of sources, the White House never established a group containing individuals not employed by the federal government to provide collective advice on such issues and has no intention of doing so."  Decl. ¶ 12.

Rather, to the extent that the President or his advisers solicited recommendations from individuals not employed by the government, this was done on an "*ad hoc* basis."  *Id*. ¶ 13.  The White House never formed a group with a consistent membership list or hosted regular or recurring meetings to provide advice on clemency issues, *id*. ¶ 14; it never provided funding or workspace for such purposes, *id*. ¶ 15; it never approved any organization, leadership structure, or subgroups for such a group, *id*. ¶ 16; nor did it approve or create any process through which members of any such group could vote could vote on (or veto) any collective advice or recommendations – nor,

---

[1] Plaintiff's complaint appears to be largely based on a February 20, 2020 *Washington Post* article entitled "White House Assembles Team of Advisers to Guide Clemency Process as Trump Considers More Pardons," Compl. ¶ 58 & n.2 [attached hereto as Ex. 2], although this article differs from the complaint in a number of respects.

more generally, did it approve or create any process by which those individuals could arrive at a collective determination on such issues, *id*. ¶ 17.

Indeed, while the Complaint references individuals who are supposedly members of the "Clemency Task Force," Compl. ¶¶ 42-57, these people "were not part of any 'Clemency Task Force' approved, created, or utilized by the White House." Decl. ¶ 18. Nor were there multiple meetings; instead, there was only a one-time meeting, in November 2019, at which only four of the eight alleged private task force members were present, and where "White House officials solicited input on clemency issues, and meeting attendees shared their individual views on such issues." *Id*. ¶ 20. There were no White House meetings regarding clemency issues at which all of the private individuals identified in the Complaint were present. *Id*. ¶ 19. And to the extent that private individuals at the November 2019 meeting recommended potential clemency candidates, the White House did not supervise, control, or even know the process that was used to select those potential clemency candidates. *Id*. ¶ 22.

## 3.   PROCEDURAL HISTORY

Plaintiff, a research and advocacy organization, filed suit against Donald J. Trump in his official capacity as President of the United States, Jared Kushner in his official capacity as Senior Advisor to the President of the United States and the Director of the White House Office of American Innovation, and the Executive Office of the President ("EOP"). Compl. ¶¶ 8-11. Plaintiff alleges that the so-called "Clemency Task Force" exists and is subject to FACA. *Id*. ¶¶ 79-90.

Plaintiff alleges five claims. The first three allege direct violations of FACA. Claim I alleges that defendants have violated FACA § 9(c), which "prohibit any action by the [advisory committee] until after the charter has been filed." *Id*. ¶¶ 98-104. Claim II alleges that defendants

have violated FACA § 10(a), which requires that FACA advisory committee meetings be noticed in advance and open to the public.  *Id*.  ¶¶ 105-111.  Claim III alleges that Defendants have violated FACA § 10(b), which governs public disclosure of certain advisory committee documents.  *Id*. ¶¶ 112-116.  Claim IV of the Complaint alleges that the purported substantive violations described in Claims I through III violate the Administrative Procedure Act ("APA").  *Id*. ¶¶ 117-123.  Finally, Claim V asks this Court to enter a writ of mandamus compelling defendants to comply with FACA. *Id*. ¶¶ 124-127.

## STANDARD OF REVIEW

The plaintiff bears the burden of demonstrating subject-matter jurisdiction.  *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).  Courts should "presume that [they] lack jurisdiction unless the contrary appears affirmatively from the record."  *Renne v. Geary*, 501 U.S. 312, 316 (1991) (citations omitted).  "Although a court must accept as true all the factual allegations contained in the complaint when reviewing a motion to dismiss pursuant to Rule 12(b)(1)," the factual allegations in the complaint "will bear closer scrutiny in resolving a 12(b)(1) motion than in resolving a 12(b)(6) motion for failure to state a claim."  *Wright v. Foreign Serv. Grievance Bd.*, 503 F. Supp. 2d 163, 170 (D.D.C. 2007), *aff'd* No. 07-5328, 2008 WL 4068606 (D.C. Cir. Mar. 17, 2008) (internal citations omitted).  The Court "may consider materials outside the pleadings in deciding whether to grant a motion to dismiss for lack of jurisdiction."  *Jerome Stevens Pharm., Inc. v. FDA*, 402 F.3d 1249, 1253 (D.C. Cir. 2005).

To withstand a motion to dismiss under Rule 12(b)(6), a complaint must "state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  The complaint must contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Twombly*,

550 U.S. at 555.  The plaintiff must, accordingly, plead facts that allow the court "to draw the reasonable inference that the defendant is liable for the misconduct alleged" and offer "more than a sheer possibility that a defendant has acted unlawfully."  *Iqbal*, 556 U.S. at 678; *see also Scott v. District Hospital Partners, L.P.*, 60 F. Supp. 3d 156, 161 (D.D.C. 2014) (court may "consider documents attached to or incorporated by the complaint in deciding a Rule 12(b)(6) motion without converting the motion into one for summary judgment *including documents referenced or cited in a complaint*.") (emphasis added).

Claims based on the purported existence of a committee subject to FACA, particularly those involving the President, are routinely resolved based on the adequacy of the pleadings or on declarations attached to motions, *i.e.*, without discovery, and in particular at the motion to dismiss stage. *See, e.g.*, *In re Cheney*, 406 F.3d 723, 730 (D.C. Cir. 2005) (en banc) (judgment for defendant appropriate based on declaration attached to papers; and reversing district court order directing discovery); *Ctr. for Arms Control & Non-Proliferation v. Pray*, 531 F.3d 836, 838-39 (D.C. Cir. 2008) (granting government's motion to dismiss on FOIA claim on basis that commission was exempt from FACA); *Dunlap v. Presidential Advisory Comm'n on Election Integrity*, No. 17-2361, 2020 WL 2800673 (D.D.C. May 29, 2020) (granting motion for dismiss and dismissing mandamus claim against presidential advisory commission); *Food & Water Watch v. Trump*, 357 F. Supp. 3d 1 (D.D.C. 2018) (granting motion to dismiss and denying motion to compel discovery); *VoteVets Action Fund v. United States Dep't of Veterans Affairs*, 414 F. Supp. 3d 61, 70 (D.D.C. 2019) (granting motion to dismiss on basis that supposed commission was not

subject to FACA); *Judicial Watch, Inc. v. U.S. Dep't of Commerce*, 736 F. Supp. 2d 24 (D.D.C.

2010) (granting motion to dismiss on basis that FACA did not apply to council in question).[2]

## **ARGUMENT**

Plaintiff's Complaint suffers from numerous threshold, pleading, and jurisdictional defects.

At the onset, FACA does not provide a private right of action, and so plaintiff's attempts (in Counts

I, II, and III) to bring suit directly under that statute fail.  Plaintiff next attempts to bring the same

substantive challenge under the APA's cause of action (in Count IV).  But it can fare no better:

the APA only applies to "agencies," and neither the President, the White House Office (of which

Mr. Kushner, sued in his official capacity, is a member of), nor the Executive Office of the

President writ large, is an "agency" pursuant to the APA.  All four Counts fail to state a claim, and

should be dismissed pursuant to Rule 12(b)(6).

Nor can plaintiff invoke this Court's mandamus jurisdiction (as it attempts in Count V) and

this Count should be dismissed pursuant to Rule 12(b)(1).  The right to mandamus relief must be

"clear and indisputable," a requirement further heightened when mandamus is aimed at the White

House Office.  This Circuit and the Supreme Court have established at least three necessary

---

[2] Courts will sometimes resolve these claims in a motion for summary judgment posture, although even there, they resolve such claims on the basis of declaration evidence, rather than formal discovery.  *See, e.g.*, *Citizens for Responsibility & Ethics in Washington v. Leavitt*, 577 F. Supp. 2d 427, 434 (D.D.C. 2008) (summary judgment appropriate when declaration "disclose[d] enough facts to establish that the experts who attended the meetings were not asked to render collective advice," and rejecting Rule [56(d)] motion); *Freedom Watch, Inc. v. Obama*, 930 F. Supp. 2d 98, 100, 102 (D.D.C. 2013) (summary judgment based on appropriate White House declaration and rejecting Rule 56(d) motion); *AAPS v. Clinton*, 997 F.2d 898, 915-16 (D.C. Cir. 1993) (remanding for future proceedings because court "simply ha[s] insufficient material in the record to determine the character of the working group and its members."); *see also CREW*, 557 F. Supp. 2d at 434 (distinguishing claim that *AAPS* supported discovery on the basis that there was a declaration in the record that provided relevant information).

In the event that this Court determines that summary judgment is the appropriate procedural vehicle, it "shall grant summary judgment if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

conditions for a committee to be subject to the FACA: (1) it must have adequate indicia of structure and formality; (2) it must be formally "established" by the President or "utilized" (*i.e.*, subject to the control of) by his advisors; and (3) it must have non-governmental members who have a vote on, or a veto over, collective recommendations or advice.  Plaintiff fails to adequately plead these requirements.  Nor are they present as a matter of fact:  the White House has proffered a sworn declaration establishing that none of these requirements is satisfied; there was no collective decisionmaking process approved by the White House, merely informal advice provided without government supervision, which is exactly the type of advice this Circuit and the Supreme Court have held are not subject to FACA.  In light of this Complaint and these facts, plaintiff cannot establish that the so-called "Clemency Task Force" clearly and indisputably exists.  Finally, even if there were ambiguity – and there is not – the D.C. Circuit and the Supreme Court have made clear that FACA must be interpreted narrowly to avoid constructions that would interfere with the President's Article II responsibilities.  Here, plaintiff would require significant interference with the President's powers to issue pardons and commutations, which, as the Supreme Court has further held, are limited only by the Constitution itself.  Such an interpretation would, at a minimum, raise significant constitutional concerns, and must be avoided.

## I.      FACA DOES NOT PROVIDE A PRIVATE RIGHT OF ACTION.

Plaintiff's first three claims are brought directly under FACA.  *See* Compl. ¶¶ 98-116 (alleging violations of FACA section 9(c), 10(a), and 10(b)).  But because FACA lacks a private cause of action – and because the existence of that right is a requirement to bring suit, *see Alexander v. Sandoval*, 532 U.S. 275, 292-93 (2001) – the claims brought directly under FACA must be dismissed.

"FACA does not provide for a private cause of action." *Lawyers' Comm. for Civil Rights Under Law v. Presidential Advisory Comm'n on Election Integrity*, 265 F. Supp. 3d 54, 66 (D.D.C. 2017) (citing *Ctr. for Biological Diversity v. Tidwell*, 239 F. Supp. 3d 213, 220-21(D.D.C. 2017)); *Union of Concerned Scientists v. Wheeler*, 954 F.3d 11, 17 (1st Cir. 2020) ("FACA contains no private right of action"); *Elec. Privacy Info. Ctr. v. Drone Advisory Committee*, 369 F. Supp. 3d 27, 37-38 (D.D.C. 2019) ("The Court concurs with the reasoning of others in this circuit that 'FACA does not provide a cause of action, given that none is apparent from the statutory text.'") (citing *Tidwell*, 239 F. Supp. 3d at 221); *see also Freedom Watch, Inc. v. Obama*, 807 F. Supp. 2d 28, 32 (D.D.C. 2011) (collecting cases holding that "FACA does not create a private right of action because there is no evidence of Congressional intent to confer a private remedy for FACA violations."). Accordingly, absent such a right, plaintiff cannot bring its claims directly under FACA, and the counts of the Complaint that attempt to do so should be dismissed.

## II. DEFENDANTS ARE NOT "AGENCIES" SUBJECT TO THE ADMINISTRATIVE PROCEDURE ACT.

Plaintiff's fourth claim is brought under the APA. *See* Compl. ¶¶ 117-123. But this claim, too, fails, because none of the defendants are an "agency" within the meaning of the APA, and thus plaintiff cannot benefit from the APA's cause of action.

The APA applies only to "agencies." *See* 5 U.S.C. § 551(1). The President of the United States is not an agency pursuant to the APA, and thus "his actions are not subject to its requirements." *Franklin v. Massachusetts*, 505 U.S. 788, 801 (1992). Accordingly, plaintiff's claim brought against the President "in his official capacity as President" cannot be brought under the APA. Compl. ¶¶ 9, 117-123.

Nor can plaintiff bring claims against the other two defendants: Jared Kushner, in his official capacity as "Senior Advisor to the President of the United States and the Director of the

White House Office of American Innovation,"[3] and the Executive Office of the President, Compl. ¶¶ 10-11, as neither of these entities is an agency subject to suit under the APA.

The Supreme Court and this Circuit have consistently recognized that while the statutory definition of "agency" may be broad, it does not encompass entities within the Executive Office of the President that do not exercise substantial independent authority.  In *Soucie v. David*, 448 F.2d 1067 (D.C. Cir. 1971), for example, the court considered the definition of "agency" under the APA which then, as now, is defined as any "authority of the Government of the United States, whether or not it is within or subject to review by another agency."  *Id.* at 1073 (quoting 5 U.S.C. § 551(1)).  This circuit concluded that the APA "apparently confers agency status on any administrative unit with substantial independent authority in the exercise of specific functions."  *Id.*  Following this reasoning, the court held that the Freedom of Information Act ("FOIA"), which at the time incorporated the APA's definition of "agency," applied to the Office of Science and Technology Policy ("OSTP"), which is an entity within the Executive Office of the President.  *Soucie*, 448 F.2d at 1073-74.  It reasoned that OSTP's function was not merely to "advise and assist the President," but it also had an "independent function of evaluating federal programs," and therefore was an agency with substantial independent authority that was therefore subject to the APA.  *Id.* at 1075.

The Supreme Court has confirmed the principle that entities that exist solely to "advise and assist the President" are not "agenc[ies]."  In *Kissinger v. Reporters Committee for Freedom of the*

---

[3] Mr. Kushner is sued in his official capacity as "Senior Advisor to the President of the United States."  *See* Compl. ¶ 10.  An official capacity suit is a way of pleading an action against a government entity, "[it] is *not* a suit against the official personally, for the real person in interest is the entity."  *Kentucky v. Graham*, 473 U.S. 159, 166 (1985).  Plaintiff's suit is thus properly understood as a suit against the White House Office of American Innovation, or the White House Office (the entity of which Mr. Kushner is a member, *see infra*).

*Press*, 445 U.S. 136, 156 (1980), the Supreme Court considered the scope of FOIA, whose definition of "agency" had been amended in 1974 to its current version, where "'agency' as defined in [5 U.S.C. §] 551(1) . . . includes any executive department, military department, Government corporation, Government controlled corporation, or other establishment in the executive branch of the Government (*including the Executive Office of the President*), or any independent regulatory agency." 5 U.S.C. § 552(f)(1) (emphasis added). The Court concluded that, despite this language, "[t]he legislative history is unambiguous . . . in explaining that the 'Executive Office' does not include the Office of the President." *Kissinger*, 445 U.S. at 156. Thus, Congress did not intend "agency" to encompass "the President's immediate personal staff or units in the Executive Office whose sole function is to advise and assist the President." *Id.* (quoting H.R. Rep. No. 93-1380, at 15 (1974) (Conf. Rep.)). The Conference Report further specified that, "with respect to the meaning of the term 'Executive Office of the President' the conferees intend[ed] the result reached in *Soucie v. David*, 448 F.2d 1067 (D.C. Cir. 1971)." *See Rushforth v. Council of Econ. Advisers*, 762 F.2d 1038, 1040 (D.C. Cir. 1985) (quoting H.R. Rep. 93-1380, at 14); *see also Meyer v. Bush*, 981 F.2d 1288, 1291 n.1 (D.C. Cir. 1993) (explaining Congress had codified the D.C. Circuit's analysis of EOP entities in *Soucie* in the 1974 FOIA Amendments).[4]

The controlling question in determining whether an entity within the Executive Office of the President is an "agency," therefore, is whether "the entity in question 'wield[s] substantial authority independently of the President.'" *Citizens for Responsibility & Ethics in Wash.* ("*CREW*") *v. Office of Admin.*, 566 F.3d 219, 222 (D.C. Cir. 2009) (quoting *Sweetland v. Walters*,

---

[4] While *Kissinger* interpreted the FOIA, the "substantial independent authority" standard applies to the APA as well. *See Dong v. Smithsonian Inst.*, 125 F.3d 877, 881 (D.C. Cir. 1997) ("Our cases . . . require[e] that an entity exercise substantial independent authority before it can be considered an agency for [5 U.S.C.] § 551(1) purposes.").

60 F.3d 852, 854 (D.C. Cir. 1995)).  In answering this question, courts have looked to whether these EOP entities have independent regulatory or funding powers or are otherwise imbued with significant statutory responsibilities.   For example, as previously mentioned, OSTP was determined to be an agency because it had independent authority to initiate, fund, and review research programs and scholarships.  *Soucie*, 448 F.2d at 1073-75.  Other courts have found the Council for Environmental Quality to be an agency because it has the power to issue guidelines and regulations to other federal agencies, *Pac. Legal Found. v. Council on Envtl. Quality*, 636 F.2d 1259, 1262 (D.C. Cir. 1980), and the Office of Management and Budget to be an agency because it has a statutory duty to prepare the annual federal budget, as well as a Senate-confirmed Director and Deputy Director.  *Sierra Club v. Andrus*, 581 F.2d 895, 902 (D.C. Cir. 1978) ("Congress signified the importance of OMB's power and function, over and above its role as presidential advisor, when it provided[] . . . for Senate confirmation of the Director and Deputy Director of OMB."), *rev'd on other grounds*, 442 U.S. 347 (1979).

But many other EOP entities lack such independent authority.  For example, President Reagan's Task Force on Regulatory Relief, which comprised senior White House staffers and cabinet officials who headed agencies, was not itself an agency because, while it reviewed proposed rules and regulations, it could not itself *direct* others to take action.  *Meyer*, 981 F.2d at 1294 ("we see no indication that the Task Force, *qua* Task Force, directed anyone . . . to do anything.").  The Council of Economic Advisors similarly lacks regulatory or funding power, and therefore is not an agency.  *Rushforth*, 762 F.2d at 1042.  Nor is the National Security Council an agency, because it only advises and assists the President in coordinating and implementing national security policy.  *Armstrong v. Exec. Office of the President*, 90 F.3d 553, 560-61 (D.C. Cir. 1996).  The Office of Administration, which provides "operational and administrative support of the work

14

of the President and his EOP staff," including IT support, is not an agency, *CREW*, 566 F.3d at 224-25, nor is the Executive Residence Staff, which supports the President's ceremonial duties, *see Sweetland v. Walters*, 60 F.3d 852, 854 (D.C. Cir. 1995).  The White House Office is similarly not an agency, *see Sculimbrene v. Reno*, 158 F. Supp. 2d 26, 35-36 (D.D.C. 2001), and neither is the White House Counsel's Office, *Nat'l Sec. Archive v. Archivist of the U.S.*, 909 F.2d 541, 545 (D.C. Cir. 1990), which is within the White House Office.  In short, under this Circuit's authority, EOP entities that implement binding regulations (CEQ), grant funding (OSTP), or have important statutorily defined functions (OMB) constitute agencies; those that advise the President (CEA, Task Force), coordinate policy among different entities (NSC), provide administrative support for the President's activities (OA, Executive Residence), or constitute his closest advisors (White House Office) do not.

These standards control the result in this case, as neither Mr. Kushner nor the EOP writ large constitutes an "agency."  First, Mr. Kushner, in his role as Senior Advisor to the President, is a member of the White House Office.  *See* Executive Office of the President, Annual Report to Congress on White House Office Personnel (June 28, 2019), https://www.whitehouse.gov/wp-content/uploads/2019/06/July-1-2019-Report-FINAL.pdf.  That Office is not subject to the APA. *Judicial Watch, Inc. v. U.S. Secret Service*, 726 F.3d 208, 225 (D.C. Cir. 2013); *Sculimbrene*, 158 F. Supp. 2d at 35-36.  Nor is the White House Office of American Innovation, of which he is the Director, as that Office is "established within the White House Office," *see* Presidential Memorandum on the White House Office of American Innovation § 1 (Mar. 27, 2017), *available at* https://www.whitehouse.gov/presidential-actions/presidential-memorandum-white-house-office-american-innovation/, and is not subject to the APA.  *See Democracy Forward Found. v.*

*White House Office of American Innovation*, 356 F. Supp. 3d 61, 65-74 (D.D.C. 2019) (White House Office of American Innovation is not an "agency").

Finally, the EOP itself is not an "agency" for purposes of the APA.  The D.C. Circuit has specifically rejected the claim that the EOP is the proper unit of analysis for determining whether an EOP entity is an "agency."  "[I]t has never been thought that the whole Executive Office of the President could be considered a discrete agency under FOIA."  *United States v. Espy*, 145 F.3d 1369, 1373 (D.C. Cir. 1998); *see also Elec. Privacy Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 266 F. Supp. 3d 297, 318 (D.D.C. 2017) ("[T]his view of the EOP [that it constitutes a "parent agency" such that the activities of its components are reviewable] has been expressly rejected by the D.C. Circuit and is at odds with the practical reality that the D.C. Circuit has consistently analyzed the agency status of EOP components on a component-by-component basis."); *Int'l Counsel Bureau v. CIA*, No. 09-2269 (JDB), 2010 WL 1410561, at *1 (D.D.C. Apr. 2, 2010).  Indeed, were it otherwise, none of the D.C. Circuit's *Soucie* case law would make sense: if a party could simply sue the "EOP," there would be no need for a component-by-component analysis.

## III.   PLAINTIFF CANNOT ESTABLISH A "CLEAR AND INDISPUTABLE" RIGHT TO MANDAMUS AND THEREFORE THIS COURT LACKS MANDAMUS JURISDICTION.

Because plaintiff cannot bring suit under either FACA or the APA, its only potential avenue of relief is through mandamus, "a drastic and extraordinary remedy reserved for really extraordinary causes."  *Dunlap v. Presidential Advisory Comm'n on Election Integrity*, 944 F.3d 945, 949 (D.C. Cir. 2019) (quoting *Cheney v. U.S. Dist. Ct.*, 542 U.S. 367, 380 (2004)).  But because plaintiff cannot show that defendants have clearly and indisputably created a committee subject to FACA – as they have not – it cannot show its entitlement to mandamus, and so "[this]

court must dismiss the case for lack of jurisdiction."  *Am. Hosp. Ass'n v. Burwell*, 812 F.3d 183, 189 (D.C. Cir. 2016).

### A. Mandamus Requires a "Clear and Indisputable Right to Relief," a Demanding Standard That is Even More Stringent When Applied Against the White House.

"[T]o show entitlement to mandamus, [the plaintiff] must demonstrate (1) a clear and indisputable right to relief, (2) that the government agency or official is violating a clear duty to act, and (3) that no adequate remedy exists."  *Dunlap*, 944 F.3d at 949 (internal citation omitted). "These three threshold requirements are jurisdictional; unless all are met, a court must dismiss the case for lack of jurisdiction."  *Burwell*, 812 F.3d at 189.  These requirements are also narrowly defined.  *See In re Cheney*, 406 F.3d  406, F.3d 723, 727-29 (D.C. Cir. 2005) (en banc); *see also id.* at 829 ("the word 'duty' . . . must be narrowly defined, and . . . a plaintiff's legal grounds supporting the government's duty to him must 'be clear and compelling') (quoting *13th Regional Corp. v. Dep't of the Interior*, 653 F.3d 758, 760 (D.C. Cir. 1980)).  Moreover, "[e]ven when the legal requirements for mandamus jurisdiction have been satisfied, however, a court may grant relief only when it finds compelling equitable grounds."  *Id.* (quoting *In re Medicare Reimbursement Litig.*, 414 F.3d 7, 10 (D.C. Cir. 2005)).  "The party seeking mandamus has the burden of showing that its right to issuance of the writ is clear and indisputable."  *Id.* (quoting *Power v. Barnhart*, 292 F.3d 781, 784 (D.C Cir. 2002)).

These standards are even more stringent in the context of a "mandamus petition involving the President or Vice President," as the court must be sensitive to "separation-of-powers considerations."  *Cheney*, 542 U.S. at 382.  These include the fact that "[a] President's communications and activities encompass a vastly wider range of sensitive material than would be true of any ordinary individual," *id* at 381, and that "the public interest requires that a coequal branch of Government afford Presidential confidentiality the greatest protection consistent with

17

the fair administration of justice, and give recognition to the paramount necessity of protecting the Executive Branch from vexatious litigation that might distract it from the energetic performance of its constitutional duties.") (internal citation omitted); *see also id.* at 385 ("Special considerations control when the Executive's interests in maintaining its autonomy and safeguarding its communications' confidentiality are implicated.").

Accordingly, in order to avail itself of this court's mandamus jurisdiction, plaintiff must demonstrate that FACA "clearly and indisputably" entitles it to relief, even when factoring in the separation-of-powers considerations inherent in a mandamus action against the President. This it cannot do.

**B. Plaintiff Cannot "Clearly and Indisputably" Show That the So-Called "Clemency Task Force" Is Subject to FACA.**

Unable to point to a specific document creating the so-called "Clemency Task Force" as an entity formally subject to FACA, Plaintiff attempts to assert the existence of a "de facto" advisory committee. This is a type of entity whose existence is, "at a minimum, . . . difficult to prove," *Food & Water Watch*, 357 F. Supp. 3d at 11, whose constitutionality has been questioned, and which may not exist as a practical matter.[5]

---

[5] *See In re Cheney*, 334 F.3d 1096, 1117-18 (D.C. Cir. 2003) (Randolph, J., dissenting) (arguing that "the *de facto* member doctrine" should be "cast aside," and emphasizing the "constitutional difficulties" posed by the de facto FACA committee theory), *vacated by Cheney*, 542 U.S. 367. The *en banc Cheney* court recognized the "severe separation-of-powers problems in applying FACA on the basis that private parties participated in, or influenced, or were otherwise involved with a committee in the Executive Office of the President," and that "we must construe the statute strictly." 406 F.3d at 728. It held that "such a committee is composed wholly of federal officials [and therefore not subject to FACA] if the President has given no one other than a federal official a vote in or, if the committee acts by consensus, a veto over the committee's decisions." *Id.* The requirement that the President *give* a non-government official a vote or a veto would seem to require some form of formal membership requirement, as opposed to the *de facto* element that the earlier doctrine would have allowed.

18

In any event, it is well established that FACA "does not extend to 'every formal and informal consultation between the President . . . and a group rendering advice." *Freedom Watch, Inc. v. Obama*, 807 F. Supp. 2d 28, 34 (D.D.C. 2011) (quoting *Pub. Citizen v. U.S. Dep't of Justice*, 491 U.S. 440, 453 (1989). Rather, there are at least three necessary criteria a group must satisfy before it could be subject to FACA: (1) the committee must have a sufficient degree of formality and structure; (2) the committee must be "established or utilized" by the government, and (3) the committee must include non-federal employees with a vote or a veto over the committee's conclusions. *See, e.g.*, *Food & Water Watch v. Trump*, 357 F. Supp. 3d 1, 11 (D.D.C. 2018); *VoteVets Action Fund v. U.S. Dep't of Veterans Affairs*, 414 F. Supp. 3d 61, 70 (D.D.C. 2019); *In re Cheney*, 406 F.3d 723, 728 (D.C. Cir. 2005) (en banc). Plaintiff has not pled that *any* of these criteria "clearly and indisputably" exists; and as a factual matter, none do. Moreover, in evaluating the question whether FACA applies to Presidential advice, the Court must consider the important separation-of-powers implications raised by that question – particularly where, as here, that advice implicates the President's exclusive Article II pardon powers. Such considerations compel the conclusion that the so-called "clemency task force" is not a task force at all, and certainly not one subject to FACA.

1. **The So-Called "Clemency Task Force" Lacks Sufficient Formality and Structure.**

"In order to implicate FACA, the President, or his subordinates, must create an advisory group that has, in large measure, an organized structure, a fixed membership, and a specific purpose." *AAPS*, 997 F.2d at 914. Or, said differently, courts look to the "formality and structure of the group." *Food & Water Watch*, 357 F. Supp. 3d at 11. "[T]hese factors . . . are not sufficient for determining the existence of a FACA advisory committee," though they are necessary for such a determination. *Id.*

19

This Circuit has recognized the degree of formality as a "continuum." *AAPS*, 997 F.2d at 915. "At one end one can visualize a formal group of a limited number of private citizens who are brought together to give publicized advice as a group." *Id.* These "would seem to be covered by the statute." *Id.* "At the other end of the continuum is an unstructured arrangement in which the government seeks advice from what is only a collection of individuals who do not significantly interact with one each other." *Id.* That group "does not trigger FACA." *Id.* Accordingly, groups with limited meetings (particularly without overlap in membership between those meetings) and without formal organizational structure, and where no collaborative work product was created, are not subject to FACA. *See Citizens for Responsibility & Ethics in Washington v. Leavitt*, 577 F. Supp. 2d 427, 432 (D.D.C. 2008).

Plaintiff fails to plead any of the requisites of formality and structure. With respect to whether the so-called "task force" has an organized structure, the Complaint pleads no indication of structure, other than, perhaps, the allegation that Mr. Kushner is the "*de facto* Designated Federal Officer." Compl. ¶ 10. There are certainly no allegations that the task force has "give[n] publicized advice as a group," *AAPS*, 997 F.2d at 915, a hallmark of a FACA committee. Moreover, the Washington Post article plaintiff cites repeatedly refers to the group as "*informal*," with different people playing different roles. (For example, according to the article, Ms. Bondi and Ms. Johnson allegedly recommend or vet applications, while other people take meetings regarding the clemency process more broadly.[6]) This is not the hallmark of an organized structure in support of collective decision-making. Nor does the Complaint address whether the membership is "fixed." Rather, it simply asserts that individuals are "members," without any factual allegations about the nature, composition, or responsibilities of membership. *See* Compl.

---

[6] This article is attached hereto as Exhibit 2.

¶¶ 39-59.  With respect to a "specific purpose," even this is not clear – as Plaintiff appears to argue that the "task force" is *both* responsible for individualized clemency recommendations and broader discussions about changing the clemency process more generally.

The Smith Declaration makes clear the lack of formality or structure.  With respect to an organized structure (or, in this case, the lack thereof), "the White House never established a group containing individuals not employed by the federal government to provide collective advice on [clemency] issues and has no intention of doing so."  Decl. ¶ 12.  Moreover, "[t]o the extent any individuals not employed by the federal government have represented themselves as being part of a 'Clemency Task Force' approved or created by the White House, those representations are inaccurate."  *Id*. ¶ 23.  *See Food & Water Watch*, 357 F. Supp. 3d at 15 (characterizing the "plaintiff's central problem" which is that "the Infrastructure Council never became operational as a FACA advisory committee.").

Rather, recommendations from non-governmental individuals were "done on an *ad hoc* basis."  Decl. ¶ 13.  The White House never provided government funding or workspace to these individuals, *id*. ¶ 15, did not approve any organization, leadership structure, or subgroups to coordinate these individuals, *id*. ¶ 16, nor did it "approve or create a process through which the members of any group could vote on (or veto) any collective advice or recommendations concerning clemency issues," *id*. ¶ 17, or "create or approve any process through which any group of individuals not employed by the federal government could arrive at collective advice or recommendations concerning such issues," *id*. ¶ 17.  These are not the hallmarks of a formal structure that typify a FACA committee.  *See, e.g.*, *CREW v. Leavitt*, 577 F. Supp. 2d 427, 432 (D.D.C. 2008) (group was not a FACA committee when it "had no formal organizational structure," and "[a]ttendees conveyed their own opinions regarding their individual areas of

expertise"); *Grigsby Brandford & Co. v. United States*, 869 F. Supp. 984, 1002 (D.D.C. 1994) ("ad hoc, unstructured meeting[s] [are] specifically exempted from FACA's ambit"); *Food & Water Watch*, 357 F. Supp. 3d at 11 (FACA may apply if group had an "organizational structure (*e.g.*, officers) and a staff") (quoting *Nader v. Baroody*, 396 F. Supp. 1231, 1233 n.4 (D.D.C. 1975)).

Nor were there formalized meetings or a fixed membership.  Plaintiff repeatedly suggests that there were repeated meetings of the "Task Force," and names individuals it alleges to be its members, implying both formal meetings and a fixed membership.  *E.g.*, Compl. ¶¶ 62, 63, 65, 66, 70-72, 87.  But this is not accurate.  Rather, the people that plaintiff references "were not a part of any 'Clemency Task Force' approved, created, or utilized by the White House."  Decl. ¶ 18.  Nor were there any "White House meetings regarding clemency issues at which all of the Alleged Private Task Force Members were present."  *Id.* ¶ 19.  Just the opposite: "[t]he White House never formed a group containing individuals not employed by the federal government with a consistent membership list or hosted regular or recurring meetings to provide advice on clemency issues."  *Id.* ¶ 14.

A "one-time meeting regarding clemency issues took place at the White House" on November 19, 2019, but "[o]nly four of the eight Alleged Private Task Force Members attended this meeting."  *Id.* ¶ 20.  The context of this meeting illustrates why FACA does not apply here.  "During this meeting, White House officials solicited input on clemency issues, and meeting attendees shared their individual views on such issues."  *Id.*  "There have not been any other White House meetings concerning clemency issues that included the same (or a substantially similar) list of attendees as the November 19, 2019 meeting."  *Id.*  Nor is the White House "aware of any prior or subsequent White House meetings similar to the one held on November 19, 2019.  It was a one-off event."  *Id.* ¶ 21.

One private individual "who attended the November 19, 2019 meeting sent a list of potential clemency candidates to the White House approximately one month later." *Id.* ¶ 22. "Moreover, some of the Alleged Private Task Force Members have occasionally recommended other potential clemency candidates to the White House on an *ad hoc* basis." *Id.* "The White House did not supervise, control, or know the process that was used to select these potential clemency candidates. The White House also does not know how many people were consulted in connection with selecting these potential clemency candidates, much less the identity of all such individuals." *Id.*

Such an informal, unstructured, unrepeated meeting does not trigger FACA. *See, e.g.*, *CREW*, 577 F. Supp. 2d at 432 (group is not a FACA committee when "it is not clear that there was any overlap in membership of the groups that attended the [various] meetings); *Freedom Watch, Inc v. Obama*, 930 F. Supp. 2d 98, 102 (D.D.C. 2013) (fact that "the individuals attending these meetings varied significantly" indicated that "alleged committee does not fall within the scope of FACA"). So too is the fact that there "is no evidence that the defendants had the goal of attaining collective advice or collaborative work product," *Freedom Watch*, 930 F. Supp. 2d at 102 – the White House did not supervise, control, or even have knowledge into the process by which any follow-up advice stemming from the meeting was given. Were it otherwise, any time a White House official met with more than one member of the public, a FACA would be created – even though the Supreme Court has explicitly rejected this result. *Pub. Citizen*, 491 U.S. at 452 (rejecting a reading of FACA that would "extend FACA's requirements to any group of two or more persons, or at least any formal organization, from which the President or an Executive agency seeks advice.").

Finally, it is not clear there was a "specific purpose" of this alleged advisory committee. Rather, there was individual solicitation of views from specific individuals, on an informal and *ad hoc* basis.  *E.g.*, Decl. ¶¶ 13, 20.  Such mere "exchanging [of] views" does not trigger FACA.  *E.g.*, *AAPS*, 998 F.2d at 914 ("[M]eetings between an assistant to the President and a changing slate of federal officials and private sector groups . . . . for the purposes of exchanging views on a variety of subjects" do not trigger FACA).

## 2. The So-Called "Clemency Task Force" Was Not "Established or Utilized" by the White House.

Another structural requirement is that the group must be "established or utilized" by the government.  5 U.S.C. app 2 § 3(2).  "An advisory group is 'established' under FACA if it is 'actually formed by the agency.'"  *VoteVets Action Fund v. U.S. Dep't of Veterans Affairs*, 414 F. Supp. 3d 61, 70 (D.D.C. 2019) (quoting *Byrd v. EPA*, 174 F.3d 239, 245 (D.C. Cir. 1999)).  "This requirement suggests that the government must take formal, affirmative steps to 'establish' one." *Id.*  Informal, or "off-the-cuff comments at a press conference" are not sufficient; rather, the government must announce concrete, formal steps, such as through an "initiation letter," to establish such a committee.  *Id.* (citing *Tidwell*, 239 F. Supp.3d at 212, 218, 228); *see also AAPS* ("Since form is a factor, it would appear that the government has a good deal of control over whether a group constitutes a FACA advisory committee. . . . In order to implicate FACA, the President, or his subordinate, must create an advisory group that has, in large measure, an organized structure, a fixed membership, and a specific purpose.").

Here, there are no allegations that the alleged "working group" has been created by "formal, affirmative steps."  Indeed, the Complaint simply alleges that the group was "established or utilized by the President and/or Defendant Kushner."  Compl. ¶¶ 3, 9, 79, 82.  Again, this is just the recitation of an element of a FACA claim; it is not a fact illustrating what the government has

24

done to formally establish such a working group, or even if it has done so.  *See Iqbal*, 556 U.S. at 678.

And, moreover, the White House never "established" such a group and has no intention of doing so.  Decl. ¶ 12.  Nor did it take any of the other steps of establishing such a group, such as funding the group, or approving the group's structure, membership, or organization.  *Id.* ¶¶ 15-17.  Nor is there any sort of foundational document or directive of which plaintiff references that created such a group; instead, "[t]o the extent the President or his advisers solicited or received recommendations concerning clemency from individuals not employed by the federal government, this was done on an *ad hoc* basis."  *Id.* ¶ 13.

Even if not "established" by the government, an advisory committee may be covered by FACA if the government "utilized" it without actually creating it.  *VoteVets*, 414 F. Supp. 3d. at 71.  But this, too, is interpreted strictly and narrowly: "An advisory committee is 'utilized' only if it is 'so closely tied to an agency as to be amenable to strict management by agency officials.'"  *Id.* (citing *Byrd*, 174 F.3d at 246).  "This standard is demanding: 'even significant influence' by the agency over the purported committee 'does not represent the level of control necessary to establish that a government agency 'utilized' an advisory panel.'"  *Id.* (quoting *Byrd*, 174 F.3d at 246); *see also Judicial Watch*, 736 F. Supp. 2d 24, 32 (D.D.C. 2010) ("[T]he government 'utilizes' a privately-formed advisory committee when agency officials exercise actual management or control over that committee.").

But, again, plaintiff pleads no such indications of "actual management or control" by the White House.  It states that the President has "designated Defendant Kushner to lead the Clemency Task Force," Compl. ¶ 39; *see also id.* ¶ 10 (describing him as the "*de facto* Designated Federal Official"), but pleads no facts establishing his responsibilities, much less how he has managed the

so-called task force.  Moreover, the Washington Post article upon which the Complaint relies suggests the *lack* of White House control, describing an "informal effort" to submit clemency recommendations" that "Alice Johnson helped coordinate," not Mr. Kushner.  The article further notes that "Kushner and others in the administration have held discussions about changing this clemency process since 2018," *see* Ex. 2, but discussions and meetings, without more, do not fall within FACA.  *See Pub. Citizen*, 491 U.S. at 453.

Nor has there been any such indicia of control.  The White House did not schedule regular or recurring meetings, Decl. ¶ 14, did not approve a formal organization or leadership structure, did not approve subgroups, did not approve a voting process, did not approve or create any process through which individuals not employed by the federal government could arrive at collective advice or recommendations concerning clemency issues, and did not provide funding or workspace in support of such efforts.  *Id*. ¶¶ 15-18.  Moreover, to the extent the White House received recommendations concerning potential clemency candidates from any of the private individuals identified in the Complaint, it "did not supervise, control, or know the process that was used to select these potential clemency candidates," nor does it even "know how many people were consulted in connection with selecting these potential clemency candidates, much less the identity of all such individuals."  *Id*. ¶ 22.  This is the exact opposite of the type of "actual management or control" that is required to say that the government "utilized" such a committee.  *Byrd*, 174 F.3d at 246; *see also Food & Water* Watch, 357 F. Supp. 3d at 12 (committee must act "at the behest of the executive").  Given this lack of formal structure, plaintiff has not "clearly and indisputably" shown his entitlement to mandamus relief.

### 3.   Non-Federal Employees Lack a Vote or a Veto.

Importantly, FACA does not apply to groups solely composed of federal officials.  5 U.S.C. app 2 § 3(2).  "[A] committee is composed wholly of federal officials if the President has given no one other than a federal official a vote in or, if the committee acts by consensus, a veto over the committee's decisions."   *In re Cheney*, 406 F.3d 723, 728 (D.C. Cir. 2005) (en banc).  "[P]articipation in committee meetings or activities, even influential participation, . . . [is] not enough to make someone a member of the committee."  *Id.*   "Absent any indication that such a structure exists, there can be no FACA obligations."  *Food & Water Watch*, 357 F. Supp. 3d at 12.

The D.C. Circuit has made clear that "[s]eparation-of-powers concerns strongly support this interpretation of FACA," at least with respect to Presidential advice, as "[i]n making decision on personnel and policy, and in formulating legislative proposals, the President must be free to seek confidential information from many sources, both inside the government and outside." *Cheney*, 406 F.3d at 728 (internal citations omitted); *see also id.* ("In light of the severe separation-of-powers problems in applying FACA on the basis that private parties participated in, or influenced, or were otherwise involved with a committee in the Executive Office of the President, we must construe the statute strictly.").

Here, the Complaint is completely silent on whether any alleged members held a vote or a veto.  *See generally* Compl.  That is a requirement in order to plead a FACA claim, and the failure to plead an essential element of its claim is fatal to plaintiff's lawsuit.  Nor was there a vote or a veto for non-governmental officials.  Setting aside the fact that no such task force existed, "[t]he White House did not approve or create any process through which the members of any group could vote on (or veto) any collective advice or recommendations concerning clemency issues, nor did it approve or create any process through which any group of individuals not employed by the

federal government could arrive at collective advice or recommendations concerning such issues." Decl. ¶ 17.  And to the extent the White House received names of potential clemency candidates, it "did not supervise, control, or know the process that was used to select these potential clemency candidates.  The White House also does not know how many people were consulted in connection with selecting these potential clemency candidates, much less the identity of all such individuals." *Id*. ¶ 22.  (The fact that non-governmental officials might, *on their own*, have some form of voting process they use to submit information to the White House would not alter the analysis, since such a group would lack the "actual management or control" by the government that is required to trigger FACA's "utilized" prong, *Byrd*, 174 F.3d at 246.  Indeed, that situation would be indistinguishable from *Public Citizen*, where the Supreme Court rejected an attempt to apply FACA to the ABA's proffering of recommendations to the Justice Department on federal judges, even though the ABA's process may well have used internal votes or vetoes.)

Nor, given the "ad hoc" and individual nature of any recommendations that were solicited, Decl. ¶ 13, would such a process even have made sense.  *See in re Cheney*, 406 F.3d at 731 ("If the [purported FACA committee's] staff's 'stakeholder meetings' involved no 'effort to achieve consensus' or 'collective judgment,' then clearly no non-government participants in those meetings exercised any vote or veto.").

### 4. Applying FACA to Advice About the President's Pardon Determinations Would Constitute Impermissible Interference With the President's Article II Powers.

Finally, the Court must consider separation-of-powers implications when determining whether advice to the President triggers FACA's requirements.  *See, e.g.*, *Cheney v. U.S. Dist. Ct. for Dist. of Columbia*, 542 U.S. 367, 370 (2004) ("Special considerations control when the Executive's interest in maintaining its autonomy and safeguarding its communications'

28

confidentiality are implicated."); *AAPS*, 997 F.2d at 910 ("A statute interfering with a President's ability to seek advice directly from private citizens as a group, intermixed, or not, with government officials, . . . raises Article II concerns.").

That is particularly true when the "risk of impermissible interference" implicates the powers committed to the President under Article II.  The D.C. Circuit has made this consideration explicit.  *See, e.g.*, *Ctr. for Arms Control & Non-Proliferation v. Pray*, 531 F.3d 836, 843 (D.C. Cir. 2008) (concluding that "[t]he risk of impermissible interference is sharpened by the Commission's mandate to 'advis[e] the President in the discharge of his constitutional authority under Article II of the Constitution to conduct foreign relations, protect national security, and command the Armed Forces of the United States.'"); *id.* at 843-44 ("Subjecting the Commission on the Intelligence Capabilities to the requirements of the FACA would certainly interfere to some substantial degree with the President's exercise of these specific and important powers, and therefore raise grave and doubtful questions about the constitutionality of the statute.").  Moreover, several concurring justices of the Supreme Court have indicated that this requirement may limit FACA's effect against the President at all, at least when the purported committee implicates his Article II powers. *Pub. Citizen*, 491 U.S. at 482 (Kennedy, J., with whom Rehnquist, C.J., and O'Connor, J., join, concurring in the judgment) ("The essential feature of the separation-of-powers issue in this suit, and the one that dictates the result, is the application of the statute encroaches upon a power that the text of the Constitution commits in explicit terms to the President [*i.e.*, the power to nominate officers]"); *id.* at 486 ("Congress cannot interfere in any way with the President's power to pardon.  The pardon power 'flows from the Constitution alone . . . and . . . cannot be modified, abridged, or diminished by the Congress.") (quoting *Schick v. Reed*, 419 U.S. 256, 266 (1974)); *id.* at 488-89 ("The mere fact that the FACA would regulate so as to interfere

with the manner in which the President obtains information necessary to discharge his duty assigned under the Constitution to nominate federal judges is enough to invalidate the Act.").[7]

That risk is particularly acute here.  As plaintiff acknowledges, Compl. ¶ 2, the President's pardon and commutation determinations are committed by the Constitution to himself alone. Congress cannot, through FACA, interfere with the President's ability to "obtain the information necessary to discharge his duty."  *Pub. Citizen*, 491 U.S. at 488-89 (Kennedy, J., with whom Rehnquist, C.J., and O'Connor, J., join).  Here, plaintiff would seek to substantially regulate the nature of the President's advice about how to exercise his commutation and pardon powers; powers that "Congress cannot interfere in any way with."  *Schick*, 419 U.S. at 266.  But this Court need not resolve that question – the mere possibility of such interference requires a narrow construction of the statute, particularly where, as here, there are no indications that this so-called "task force" is subject to FACA.  And, at a minimum, such constitutional concerns – particularly when combined with the fact that the so-called "Clemency Task Force" fails to satisfy any of the requirements of FACA, much less clearly and indisputably – indicates that there is no such committee subject to FACA.

---

[7] The majority in *Public Citizen* did not reach the constitutional issue, but concluded that principles of constitutional avoidance required adopting the narrower construction of FACA. *Pub. Citizen*, 491 U.S. at 466-67.

## <u>CONCLUSION</u>

For these reasons, this Court should dismiss plaintiff's Complaint for lack of subject-matter jurisdiction and failure to state a claim.

Dated:  June 12, 2020                              Respectfully submitted,

                                                   JOSEPH H. HUNT
                                                   Assistant Attorney General

                                                   DAVID M. MORRELL
                                                   Deputy Assistant Attorney General

                                                   ELIZABETH J. SHAPIRO
                                                   Deputy Director, Federal Programs Branch

                                                   */s/ Joseph E. Borson*
                                                   JOSEPH E. BORSON (Va. Bar No. 85519)
                                                   United States Department of Justice
                                                   Civil Division, Federal Programs Branch
                                                   1100 L Street, NW
                                                   Washington, D.C. 20005
                                                   Tel: (202) 514-1944 / Fax: (202) 616-8460
                                                   E-mail: Joseph.Borson@usdoj.gov